## People's Savings Bank, et al. v. Wright, et al.

(Decided February 21, 1919.)

### Appeal from Ohio Circuit Court.

1. Appeal and Error—Finding of Chancellor.—Where the evidence preponderates in such a way as to convince the appellate court that the chancellor has erred in his finding of fact, the judgment should be reversed.

2. Bills and Notes—Release—Evidence.—Defendant in a suit upon notes executed by him, as part price for machinery purchased, pleaded that he was released from liability thereon, by the obligee accepting as sole payor, one to whom the defendant sold the machinery, evidence examined and held to be insufficient to establish the release contended for.

3. Bills and Notes—Release—Acceptance—Consideration.—The acceptance of a stranger to the note as payor constitutes sufficient consideration for the release by the payee of the original maker.

GLENN & SIMMERMAN for appellants.

HEAVRIN & MARTIN, WOODWARD & KIRK and A. D. KIRK for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On June 6, 1910, L. T. Wright and L. C. Craig purchased from the Heilman Machine Works, a corporation at Evansville, Indiana, hereinafter called "the company," a traction engine, a threshing outfit and a small sawmill, for which they agreed to pay the sum of $2,200.00, none of which was paid in cash, but all of it by deferred payments distributed over a number of years,

and evidenced by promissory notes.  A lien was retained upon the property purchased, and Craig also executed a mortgage on a small tract of land he owned.  The purchasers operated the machinery, running the sawmill when not operating the thresher, for about a year, when Wright purchased the interest of Craig and at his solicitation the latter was released by the company from all obligation upon any of the notes, also releasing its mortgage upon Craig's tract of land.  But the company, before it agreed to release Craig, demanded additional security from Wright, whereupon he and his son, Albert Wright, with the wife of L. T. Wright, executed a mortgage on two small tracts of land owned by the two Wrights and Albert Wright took the place of Craig as obligor on the notes. After that the Wrights operated the machinery in the same manner until some time in May, 1913, when another trade was gotten up between L. T. Wright and Craig whereby the latter again assumed control of the machinery and continued to operate it until about the time of or just before the filing of this suit.  In the meantime L. T. Wright had made some small payments on the indebtedness, and in 1912 he executed a mortgage on a crop of tobacco, which was afterwards sold for $247.50, for which the company gave him credit.  He had also turned over to the company a second class engine which he owned, which was accepted at the price of $575.00, with which sum he was also credited on the notes.  After the second trade between Wright and Craig under which the latter operated the machinery he made some small payments for which the company gave proper credits, and at the time of the filing of this suit five of the original notes, aggregating $1,050, were past due and unpaid, and to collect them the suit was filed against the two Wrights, Craig and Mrs. L. T. Wright, seeking a personal judgment against all of the defendants except Mrs. Wright, and an enforcement of the lien against the machinery and the land mortgaged by the Wrights.  The notes, in the meantime, had been assigned and transferred by the company to appellant, the People's Savings Bank, who filed the suit, but the company, before a submission of the cause, came into the case by a proper pleading, adopting the allegations theretofore made by plaintiff in all of its pleadings. The Wrights answered and in substance claimed that they had been released from all liability upon the notes, which re-

lease, they alleged, was effected when they claim to have sold the machinery to Craig in May, 1913. They further insisted on additional payments which they alleged had been made and for which no credit had been given. By a separate answer Craig pleaded his release, which occurred some time in the year 1911, when his interest was purchased by the Wrights. Appropriate pleadings put these matters in issue and upon final submission, the court dismissed the petition as to the Wrights, but gave a personal judgment against Craig, and from that judgment the plaintiffs prosecute this appeal, but there is no cross-appeal prosecuted by Craig.

It is insisted by plaintiffs' counsel on this appeal that conceding the evidence to be sufficient to authorize a finding that the Wrights were released, as they claim, then there was no consideration for the release, and it therefore is not binding. This contention no doubt would be true if all of the original makers of the notes were at that time bound thereon, but the evidence is conclusive that in 1911 Craig had been released from all liability on the notes, and the mortgage which he had executed upon his land had been surrendered and cancelled. This, as we have stated, was upon the consideration that the Wrights executed a mortgage upon the land sought to be sold in this case. If Craig was released in 1911, he became, as between him and the obligee in the notes, as much a stranger to them as if he had never executed them. So that in 1913, when the Wrights claimed that they were released by Craig assuming the payment of the notes, if the company, agreed to that arrangement and agreed to look to Craig alone for their payment, he at that time not being obligated thereon, there was a sufficient consideration for the novation, and this contention can not be upheld. The controversy is then reduced to but one issue, which is one of fact, it being whether the company agreed to release the Wrights and to look only to Craig for payment of the notes at the time the latter took charge of the machinery in May, 1913.

We have carefully read all of the testimony in the record, some of it more than once, and we have failed to find any witness who testified in the case supporting the contention of the Wrights, save L. T. Wright himself. He testified in substance upon this issue that he had gotten tired of running the mill, and he had concluded to sell out to Craig and notified the company of that fact,

and that it sent its representative, Mr. Gibson, who agreed to the arrangement and to release Wright, and that it was agreed that his mortgage and notes should be immediately sent to him, which, however, was never done, and about which he does not appear to have been seriously concerned. No writing of any character was entered into at the time, as had been done when Craig was released, two years before. Another witness, upon whose farm the mill was being operated at the time, said that Gibson told him that Mr. Wright was "out of it," but Gibson denies the testimony of both Wright and the latter witness. However, the statement, if true, that Wright was "out of it," viewed in the light of the facts, was by no means inconsistent with the latter's continued liability. Prior to the time that statement is alleged to have been made there had been continuous efforts to procure payments to be made on the indebtedness, nearly all of which were fruitless. When the mill was turned over to Craig, at the time it is claimed the release of the Wrights was made, it was agreed that Gibson should collect from the man whose timber was being sawed at the rate of two dollars per hundred for the lumber, and it was with reference to this matter that the alleged statement, attributed to Gibson, was made. If made by him it was in a sense true, and was but a statement to show his authority to collect for the sawing. Prior to that time, Wright had moved the mill to that site and had entered into a contract to saw lumber for the witness who would be under obligation to pay Wright if the latter continued to operate the mill; and since under the arrangement for Craig to operate the mill the company was to collect a part of the charges for sawing the lumber, it would not necessarily follow that by the statement "Wright is out of it," alleged to have been made plaintiffs' representative meant that he was released from all liability upon the indebtedness, but only that he was relieved of the task of carrying out that particular contract of sawing which, under the arrangement, had been undertaken by Craig. Other statements in letters filed are equally reconcilable with the continued obligation of the Wrights upon the notes. A number of witnesses in behalf of the plaintiff testified positively that no such release as contended for was ever made. Neither Craig nor the engineer at the mill, both of whom were present, testified to any such release. Upon this point Craig

stated: "Q. Was anything said about Wrights being released or the notes surrendered, what about that? A. I do not remember about that."

The engineer testified that he did not hear the conversation, but that he was afterwards told by Mr. Wright that he had been released, which, of course, is no testimony at all. Albert Wright testified that Gibson told him that he and his father were released. This, however, is subject to the same explanation as is that which Gibson is alleged to have made to the witness Minton upon whose land the sawmill was being operated. So that if the case should be rested upon the testimony of the witnesses alone directly upon the point, it is extremely doubtful whether the finding of the chancellor that the Wrights were released could be upheld by us, under the rule governing our right to review findings of fact in equity cases. That rule is different between the verdict of a properly instructed jury and the judgment of the chancellor upon the facts. In the case of the verdict of a properly instructed jury, we are not authorized to disturb it unless it is flagrantly against the evidence, while the rule applicable to the judgment of the chancellor, rendered in an equity case, is that while his judgment as to the facts is on appeal entitled to some weight, yet this court will judge for itself of the sufficiency or insufficiency of the evidence, and if it is found to be insufficient to support the judgment, it will be reversed. But in addition to the testimony referred to, there are circumstances in this case which convince us almost beyond doubt of the error of the chancellor's finding that the Wrights were released. We have seen that no writing of any character was executed, evidencing in any manner the alleged release; and furthermore, if defendants' contention be true, the company not only released the Wrights from their personal obligation on the notes but also released the lien upon the land of both father and son for no other consideration than the personal obligation of Craig, whom all parties concede to be wholly insolvent. Such a course does not accord with the conduct of business men. It would have been entirely unnatural and from a business standpoint both unusual and inexplainable. Beyond these circumstances the record discloses that some time in September, 1913, about four months after the Wrights claim to have been released, L. T. Wright made a proposition to the company to release him from all liability on the

notes and surrender the mortgage upon the land of himself and son if he would pay the company $650.00 cash, including the tobacco crop hereinbefore mentioned, and on October 13, 1913, he wrote the company a letter in which, after referring to preparing the mortgaged tobacco for the market, he says: "I will haul it off the first season, and I will know what I can do about taking up my notes. If my tobacco brings what it ought, I can pay you the $650.00."

The proposition and letter just referred to are wholly inconsistent with the defense of a release relied on in the answer. In fact there is no accounting for either the proposition or the letter without the recognition of a continued liability upon the notes, so that when all the facts and circumstances are considered, we can find no escape from the conclusion that the court's finding that the release had been granted was not only against the weight of the evidence, but against the great preponderance of the evidence. Under the rule, *supra,* it is not only our right but our duty to find the facts in accordance with the testimony. This compels us to hold that no release had ever been granted, as contended for.

Wherefore, the judgment is reversed with directions to render judgment against L. T. and Albert Wright as prayed for, and to credit it with the proceeds of the machinery which has been ordered sold, and then direct the mortgaged land, or enough of it, sold to pay the balance of the judgment, and for such further proceedings as are not inconsistent herewith.